**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

REBECCA VARNEY

Plaintiff,

v.

CITY OF COLORADO SPRINGS, COLORADO;
COLORADO SPRINGS POLICE CHIEF ADRIAN VASQUEZ, in his official capacity;
COLORADO SPRINGS POLICE OFFICER DAVID KESTER, in his individual capacity;
and COLORADO SPRINGS POLICE OFFICER CARLOTTA RIVERA, in her individual capacity,

Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Rebecca Varney, by and through her attorneys at Spark Justice Law LLC, alleges as follows:

## I.    INTRODUCTION

The events giving rise to this case occurred during a period of vulnerability and distress for Plaintiff Rebecca Varney as she attempted to leave her abusive marriage. After enduring a weekend of renewed violence and abuse from her ex-husband, Ms. Varney contacted the Colorado Springs Police Department for help and much needed protection.[1]   In response, Ms. Varney was belittled, discounted, blamed for her own abuse, and maliciously prosecuted.  Rather than responding to Ms. Varney's report of

---

[1] While Ms. Varney and her ex-husband were married at the time of these events, Ms. Varney subsequently filed for and obtained a divorce decree.  Ms. Varney refers to him as her ex-husband throughout this Complaint for the sake of clarity and consistency.

1

abuse with compassion and concern, Defendants targeted Ms. Varney, tampering with a key witness and deliberately misrepresenting evidence to a judicial officer to obtain an arrest warrant, entangling Ms. Varney in the criminal justice system for an extended period of time and causing her economic and non-economic damages.

On the morning of July 18, 2021, Ms. Varney called the Colorado Springs Police Department ("CSPD") to report the theft of her property.  Two nights earlier, on July 16, 2021, Ms. Varney had been sexually assaulted by her ex-husband, and in the ensuing altercation, her ex-husband fractured her wrist.  Ms. Varney's ex-husband – who was an active-duty member of the Army – was immediately served a Military Protective Order ("MPO") that prohibited him from contacting Ms. Varney.  This was at least the third MPO Ms. Varney's ex-husband had been served in connection with their two-year marriage. Despite such, he returned to their communal home and took possessions belonging to Ms. Varney while she was at the hospital seeking treatment for her injured wrist.  Ms. Varney called the Military Police regarding the theft, but she was informed they could not help her because the theft had taken place off-base.

Ms. Varney was nervous about calling CSPD.  Ten months earlier, in September 2020, Ms. Varney had accidentally scratched her ex-husband while defending herself and her dogs from his abuse.  When the police arrived, Ms. Varney had been falsely accused of being the "primary aggressor," which resulted in an automatic protection order being issued against her.  Ms. Varney, desperate to leave her abusive marriage and glad for an initial order prohibiting contact between herself and her ex-husband, decided to take a plea deal that included probation rather than contest the charges.  (At her ex-husband's request, Ms. Varney's protection order was later amended to a simple prohibition against

2

harassing conduct.)  Because of these circumstances, Ms. Varney was worried to call the police.  Still, Ms. Varney was motivated to call CSPD because she had been taking active steps to leave her ex-husband and needed her possessions returned to properly effectuate her plans, which included an imminent move to accept a job offer across the country.  Ms. Varney also had video recordings and eyewitnesses who observed her ex-husband's abuse on July 16, 2021 and his subsequent theft of her possessions, which she felt confident would dispel any confusion over who was at fault.

Shortly after Ms. Varney called to report her ex-husband's theft, CSPD dispatched Defendants CSPD Officers David Kester and Carlotta Rivera to Ms. Varney's home.  Prior to arriving, Officers Kester and Rivera learned of Ms. Varney's probation and restraining order, but the officers later admitted that they had "kinda glanced at" the restraining order and found its terms "confusing."  The officers were informed by the dispatch officer that Ms. Varney had reported a theft and a possible domestic assault, of which she was the victim.

Officers Kester and Rivera failed to take the steps necessary to conduct a thorough and fair investigation into Ms. Varney's claims, a fact which was later acknowledged by an Internal Affairs investigation conducted by CSPD.  Instead, the officers approached their investigation having already concluded that Ms. Varney had violated the 2020 protection order, confirming her fears.  Neither Officer Kester nor Officer Rivera acknowledged Ms. Varney's report that her ex-husband had sexually and physically assaulted her on July 16, 2021.  Officer Kester repeatedly interrupted, talked over, and dismissed Ms. Varney's account of her experiences, seemingly ignoring facts that did not align with his view of Ms. Varney as the aggressor and interrogating her about details that

3

he seemed to think would undermine her credibility.  When Ms. Varney played the officers a video recording of her ex-husband's abuse on July 16, 2021, the officers downplayed her ex-husband's actions and asked questions indicating that the officers did not believe her.  The officers spoke to Ms. Varney for a total of ten minutes, only two minutes of which they spent discussing what happened on the night of July 16, 2021, before leaving her home without further investigatory contact.

In contrast, Officer Rivera interviewed Ms. Varney's ex-husband for approximately forty minutes after making repeated attempts to contact him.  During this call, Officer Rivera openly stated that she viewed Ms. Varney's ex-husband as the victim, solicited his uninterrupted narrative, and did not at any point ask Ms. Varney's ex-husband about Ms. Varney's allegations of abuse.  Officer Rivera induced Ms. Varney's ex-husband to state that Ms. Varney had violated her restraining order by misrepresenting the basis for Ms. Varney's call and informing him – contrary to Ms. Varney's own statements – that Ms. Varney intended to press assault charges against him.  Notably, Ms. Varney's ex-husband later recanted these statements, explaining that he felt pressured into cooperating with the police.  Further, although both Ms. Varney and her ex-husband named the same two eyewitnesses to these events, neither Officer Kester nor Officer Rivera made any attempt to speak to the witnesses about what they had seen, nor did they seek to obtain additional camera footage which might corroborate either party's story, despite being aware of multiple recordings.

In his application for an arrest warrant, Officer Kester's affidavit deliberately misrepresented the events of July 16, 2021 and omitted essential facts, the most important of which was Ms. Varney's report of her ex-husband's physical and sexual

4

abuse of her that night. As a result of Officer Kester's misrepresentations, a warrant was issued on July 18, 2021 for Ms. Varney's arrest on charges of harassment and violation of a protection order.

On July 19, 2021, Ms. Varney filed a complaint with CSPD regarding Officers Kester and Rivera's conduct throughout their biased investigation. In particular, Ms. Varney reported that Officers Kester and Rivera had ignored or downplayed her reports of her ex-husband's sexual, physical, and animal abuse, and that Officer Rivera had lied to her ex-husband to convince him to agree that Ms. Varney's attempts to rescue her dogs from potential abuse constituted harassment. After the resulting Internal Affairs investigation found that Officers Kester and Rivera had conducted an incomplete investigation into Ms. Varney's claims, the officers were both reprimanded for failing to interview the available witnesses, and Officer Kester was disciplined for filing an incomplete offense report. However, neither Officer Kester nor Officer Rivera was provided any discipline or training relating to their conduct during their interviews with Ms. Varney and her ex-husband, their misrepresentation of evidence to support a prosecution for harassment, nor their omission of material facts from the warrant application that resulted in Ms. Varney's prosecution. Further, neither the DA's office nor the public defenders' office was ever informed of the Internal Affairs investigation.

Although Ms. Varney and her attorney attempted for several months to have the warrant quashed or the charges dismissed, Ms. Varney ultimately spent 36 hours in jail and paid hundreds of dollars to be released on bond. Upon review of the investigation file, the DA's office dismissed the case against Ms. Varney on October 29, 2021 – just nine days after Ms. Varney turned herself in. Ms. Varney suffered significant injury as a

result of Defendants' actions. First, Ms. Varney suffered from a loss of liberty and property through her needless contact with the criminal legal system. Second, as a direct result of the arrest warrant, Ms. Varney lost employment opportunities and income, thereby remaining financially dependent on her ex-husband and delaying her ability to obtain a divorce. Third, the arrest warrant delayed Ms. Varney's ability to seek protection from her abusive ex-husband, who continued to contact her despite the MPO that was still in place, as Ms. Varney was afraid to seek a civilian protection order until her criminal case was resolved. Finally, Ms. Varney suffered emotional distress and other forms of non-economic damages, including the loss of her sense of security and individual dignity, and she now lives in fear that she will be discredited, disbelieved, and arrested if she ever calls law enforcement for help.

## II.   JURISDICTION AND VENUE

1. This action arises under the Constitution of the United States and is brought pursuant to the Fourth and Fourteenth Amendments to the United States Constitution through 42 U.S.C. § 1983, and Article II, §§ 7, 25, 29 of the Constitution of the State of Colorado through C.R.S. § 13-21-131. Subject-matter jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 because, as is shown more fully in this Complaint, Plaintiff's claims arise under the Constitution of the United States, namely the Fourth and Fourteenth Amendments to the United States Constitution.

2. Jurisdiction over Plaintiff's pendent state law claims is proper under 28 U.S.C. § 1367(a) because they are so related to Plaintiff's claims arising under federal law that they form part of the same case or controversy.

6

3.      Insofar as Plaintiff seeks to enforce her rights under the Fourth and Fourteenth Amendments to the United States Constitution, jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988(b).  Insofar as Plaintiff seeks to enforce her rights under Article II, §§ 7, 25, 29 of the Constitution of the State of Colorado, jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by C.R.S. § 13-21-131(3).

4.      Venue is proper in the United States District Court for the District of Colorado pursuant to both 28 U.S.C. § 1391(b)(1) and (2).  Specifically, venue is proper under 28 U.S.C. § 1391(b)(1) because all of the events and omissions alleged herein occurred within the State of Colorado.  Venue is also proper under 28 U.S.C. § 1391(b)(2) because at the time of the events and omissions giving rise to this litigation, all of the Defendants resided in Colorado, the state in which the District of Colorado is located.

## III.      PARTIES

5.      At all relevant times, Plaintiff Rebecca Varney was a resident of and domiciled in the state of Colorado.

6.      Defendant City of Colorado Springs, Colorado ("Colorado Springs" or "Defendant Colorado Springs") is a municipality within the State of Colorado.

7.      Defendant Colorado Springs Police Chief Adrian Vasquez ("Defendant Vasquez"), in his official capacity, operates business from an office located at 705 S. Nevada Avenue, Colorado Springs, Colorado 80903.

8.      As is pertinent to this action, Defendants Colorado Springs and Vasquez are responsible for maintaining department policies regarding proper investigative

7

methods, including how to avoid manufacturing purported probable cause where it does not exist.

9.     Defendants Colorado Springs and Vasquez are responsible or ultimately liable for the oversight, supervision, and training of Colorado Springs Police Department ("CSPD") officers.

10.     At all times relevant to this lawsuit, Defendant David Kester ("Defendant Kester") was a resident of and domiciled in the State of Colorado.

11.     At all times relevant to this lawsuit, Defendant Kester was employed by Defendant City of Colorado Springs as a POST-certified police officer with the Colorado Springs Police Department.

12.     Defendant Kester is obligated to follow and enforce policies established or adopted by Defendants Colorado Springs and Vasquez, and he receives training on how to do so.

13.     At all times relevant to this action, Defendant Kester understood that should he violate a policy of Defendants Colorado Springs and Vasquez or act outside of his training, he would be subject to an Internal Affairs investigation and possible discipline, up to and including termination.

14.     At all times relevant to this lawsuit, Defendant Carlotta Rivera ("Defendant Rivera") was a resident of and domiciled in the State of Colorado.

15.     At all times relevant to this lawsuit, Defendant Rivera was employed by Defendant Colorado Springs as a POST-certified police officer with the Colorado Springs Police Department.

8

Case No. 1:23-cv-01768-CNS-MDB    Document 1    filed 07/12/23    USDC Colorado    pg 9 of 69

16.     Defendant Rivera is obligated to follow and enforce policies established or adopted by Defendants Colorado Springs and Vasquez, and she receives training on how to do so.

17.     At all times relevant to this action, Defendant Rivera understood that should she violate a policy of Defendants Colorado Springs and Vasquez or act outside of her training, she would be subject to an Internal Affairs investigation and possible discipline, up to and including termination.

## IV.    FACTUAL ALLEGATIONS

### In July 2021, Ms. Varney's Ex-Husband Sexually and Physically Assaulted Ms. Varney, Ultimately Leading Her to Contact Law Enforcement

18.     On July 18, 2021, Rebecca Varney called CSPD as the culmination of multiple acts of abuse her ex-husband had committed against her over the course of the previous two days.

19.     Ms. Varney is a survivor of domestic violence perpetrated by her ex-husband, to whom she was married from June 2020 until February 2023.

20.     Over the course of their marriage, Ms. Varney's ex-husband subjected Ms. Varney to significant and repeated physical, emotional, financial, and sexual abuse.  Ms. Varney's ex-husband twisted Ms. Varney's arms, periodically took her phone and car keys, hurt or threatened to hurt her dogs, forced her to quit her job, and sexually assaulted her on multiple occasions.

21.     Ms. Varney's ex-husband was a member of the Army until December 2021 and was on active duty at all times relevant to this action.

22.     Over the course of their marriage, Ms. Varney successfully obtained several Military Protective Orders ("MPOs") against her ex-husband because of his abuse.

9

23. MPOs are written orders issued by a soldier's commander and, unlike Civilian Protection Orders ("CPOs"), are not enforceable by civilian police or courts.

24. Prior to the events of July 2021, Ms. Varney had never sought a CPO against her ex-husband.  Instead, she relied on the MPOs for protection.

25. On the night of July 16, 2021, Ms. Varney's ex-husband sexually assaulted Ms. Varney by repeatedly forcing his hands down her pants and underwear and attempting to digitally penetrate her vagina.

26. Although Ms. Varney tried to stop her ex-husband by grabbing his wrist and telling him "no," her ex-husband continued to sexually assault her.

27. At some point during the assault, Ms. Varney was able to get away from her ex-husband.

28. Ms. Varney's ex-husband, infuriated, began to shout at Ms. Varney.

29. During the altercation, Ms. Varney's ex-husband shoved Ms. Varney against the wall and focused his attention on her dogs, which he had previously abused by hitting them in the face, kicking them, dragging them, and threatening to kill them.

30. Ms. Varney attempted to protect her dogs by pushing her way into the room where they were being held by her ex-husband.  In response, her ex-husband slammed the door on Ms. Varney's arm, injuring her wrist and effectively preventing her from entering the room.

31. Desperate to save her dogs, Ms. Varney retreated to her roommate's bedroom, where she called her ex-husband's sergeant and pleaded for help.

32.     The sergeant called Ms. Varney's ex-husband's cell phone and instructed her ex-husband to leave the home and stay in a "cool-down room" on the Fort Carson base.

33.     Prior to departing, Ms. Varney's ex-husband picked up a bedside table and smashed it into the ground and on the bed, leaving shattered glass all over the surrounding areas and leaving the metal frame of the bedside table on top of the bed.

34.     Both of Ms. Varney's roommates witnessed this altercation, as well as previous instances of Ms. Varney's ex-husband's abuse of Ms. Varney and her dogs.

35.     The following day, Ms. Varney was in so much pain from her ex-husband's physical assault that she went to the hospital to seek treatment for her injured wrist.

36.     Because Ms. Varney's ex-husband was in the military, Ms. Varney went to Evans Hospital on the Fort Carson base.

37.     The same day, July 17, 2021, Ms. Varney's ex-husband's superior officers issued an MPO forbidding him from contacting Ms. Varney.

38.     While Ms. Varney was away from their shared home, her ex-husband obtained permission from his superior officers to return to the home.

39.     When Ms. Varney's ex-husband returned to the home, he trashed the house, leaving garbage, clothing, and other objects strewn across the floor and shutting off the air conditioning and hot water.

40.     Ms. Varney's ex-husband also took many of his and Ms. Varney's communal possessions, as well as Ms. Varney's personal belongings, including brand-new kitchen equipment, clothing, and intimate personal effects.

11

41.     While on the Fort Carson base, Ms. Varney watched her ex-husband take these belongings through the cameras installed in their home, which were linked to an application on her phone.

42.     When Ms. Varney realized that her ex-husband had trashed their shared home and stolen her personal possessions, Ms. Varney contacted the military police ("MPs") on the Fort Carson base.

43.     The MPs advised her that they did not have jurisdiction, as Ms. Varney's home was not located on-base.

44.     The MPs instructed Ms. Varney to call CSPD for help regarding her stolen property.

45.     While at the hospital, the medical team treating Ms. Varney provided Ms. Varney with both a domestic violence advocate as well as a Sexual Assault Response Coordinator through the Sexual Harassment/Assault Response Program ("SHARP").

46.     The medical team splinted Ms. Varney's wrist, and Ms. Varney was discharged from the hospital after speaking with the domestic violence and SHARP advocates provided to her.

**When Ms. Varney Called CSPD to Retrieve Her Stolen Property, CSPD Officers Kester and Rivera Belittled and Interrogated Her, Ignoring Her Claims of Abuse**

47.     On Sunday, July 18, 2021, Ms. Varney called CSPD at approximately 10:00 A.M. to report the theft of her personal belongings by her abusive ex-husband.

48.     Ms. Varney informed the dispatcher that her ex-husband had fractured her wrist the previous Friday night, July 16, 2021.

12

49.    Ms. Varney informed the dispatcher that her ex-husband had entered the house and taken her possessions on Saturday, July 17, 2021, while she was at the hospital being treated for injuries he had caused.

50.    Ms. Varney explained to the dispatcher that she did not think that she was permitted to call the police because she was on probation.

51.    CSPD dispatched on-duty officers Defendants David Kester and Carlotta Rivera to Ms. Varney's house to investigate the report of theft and a possible domestic assault.

52.    Defendants Kester and Rivera arrived at Ms. Varney's house at or around 10:26 A.M., and their subsequent interactions with Ms. Varney were recorded on their body-worn cameras.

53.    Ms. Varney pointed out the utility closet where one of her roommates was attempting to fix the water heater, explaining that her ex-husband had shut off their hot water.

54.    Defendant Rivera remained next to Ms. Varney's roommate throughout the officers' visit but did not speak to the roommate at any point.

55.    When asked to explain what was going on, Ms. Varney answered, "My husband has been sexually and physically assaulting me.  He ended up slamming my wrist into the door and so I had to go to the hospital yesterday because I had a fractured wrist."

56.    Ms. Varney was wearing a splint on her left wrist, which was visible to Defendants.

57.     Neither Defendant responded to Ms. Varney's report of sexual assault by asking her any follow-up questions or offering any resources available to victims of sexual violence.

58.     Instead, Defendant Kester responded, "'Kay."

59.     As Ms. Varney began to speak again, Defendant Kester interrupted her to ask, "What did you tell the people at the hospital?"

60.     When Ms. Varney attempted to answer, Defendant Kester interrupted Ms. Varney to inform her that the hospital was required to call CSPD.

61.     Ms. Varney told the officers that she had gone to Evans Hospital on the Fort Carson base because her ex-husband was in the Army, indicating that she believed the hospital had not called CSPD because the hospital was on-base.

62.     Defendant Kester told her that the hospital was still required to call CSPD.

63.     Ms. Varney informed the officers that the hospital had provided her with a domestic violence advocate.

64.     Neither officer acknowledged Ms. Varney's report that the hospital had determined that Ms. Varney's situation warranted a domestic violence advocate.

65.     Defendant Kester asked Ms. Varney multiple questions to determine whether Ms. Varney had gone to Evans Hospital, despite her previous report of such.

66.     Ms. Varney confirmed that she had gone to Evans Hospital for treatment and informed Officer Kester a second time that the hospital had provided her with a domestic violence advocate.

67.     Defendant Kester interrupted Ms. Varney to ask whether the hospital had the Military Police come out.

68. Ms. Varney stated that the hospital did not call the Military Police because she does not live on-base.

69. Ms. Varney stated that she was in the process of gathering the necessary paperwork to seek a civilian protection order against her ex-husband.

70. Defendant Kester responded, "But he's in the Army, right?"

71. Ms. Varney confirmed that her ex-husband was in the Army and began to inform the officers that she had been issued an MPO.

72. Before Ms. Varney finished conveying this information, Defendant Kester asked where the assault happened.

73. Neither officer asked any follow-up questions regarding the MPO, nor did either officer ask to see a copy of it.

74. Ms. Varney gestured to the door at the end of the hallway leading to the room in which her ex-husband had trapped her dogs and stated, "That door is what fractured my wrist."

75. Defendant Kester replied, "Oh, that makes more sense."

76. Defendant Kester did not otherwise respond to Ms. Varney's reports of physical assault, sexual assault, and domestic abuse.

77. Ms. Varney described how, while seeking treatment for her injured wrist, she had watched her ex-husband take her belongings through the cameras in their home.

78. Defendant Kester interrupted, "You guys are married, though, right?"

79. Ms. Varney confirmed that she and her ex-husband were married and stated that her ex-husband had stolen various items in the home, including her intimate property, and that she wanted her things back "because it's a lot of money he stole."

15

80.    Ms. Varney stated that she called the Military Police, who informed her that they did not have jurisdiction and that she should call CSPD.

81.    Ms. Varney explained that she wanted to file a police report for theft and wanted to determine whether the belongings that her ex-husband left behind now belonged to her.

82.    Ms. Varney confirmed that she and her ex-husband were getting divorced but noted that she had not yet filed any paperwork.

83.    Defendant Kester informed Ms. Varney that until she and her ex-husband got divorced and a judge finalized the division of property, the property belonged to them both, jointly.

84.    Ms. Varney asked if that meant she could sell anything she wanted.

85.    Defendant Kester advised Ms. Varney to wait until she received the divorce decree, at which point she could sell whatever the judge awarded to her.

86.    As Defendant Kester spoke, Ms. Varney was cooperative and respectful, repeatedly nodding and saying, "Okay."

87.    Ms. Varney asked how she could retrieve the items her ex-husband had taken.

88.    Defendant Kester requested to see the video footage of Ms. Varney's ex-husband taking Ms. Varney's belongings and stated, "As far as the property, I mean – pots and pans . . . ?"

89.    Ms. Varney again explained that the property had significant value.

16

90.    After Ms. Varney made this statement, Defendant Kester became visibly annoyed, and Ms. Varney shrank back from Defendant Kester, intimidated by his expression and body language.

91.    Defendant Kester said, "What I'm trying to explain to you is that when you guys are married, your property is his property, his property is your property, it's combined property."

92.    Ms. Varney questioned why she could not sell anything if it also belonged to her.

93.    Defendant Kester replied, "Because now we're giving someone else's property away.  You're doing it to be vindictive."

94.    Defendant Kester continued that any joint property that Ms. Varney's ex-husband had taken meant that "he's just in possession of it, [it's] still his property," and that "if you take your – his stuff and then sell it, you may end up getting in trouble depending on what the circumstances are."

95.    At this point, Defendant Kester once again claimed that Ms. Varney was "selling it to be vindictive."

96.    Ms. Varney explained that her intent was to leave the state, and that selling some items might help her complete the move.

97.    Defendant Kester replied, "If you're selling it to be vindictive, that's a crime."

98.    Defendant Kester reiterated to Ms. Varney to wait until she and her ex-husband obtained a divorce decree.

99.    Defendant Kester stated, "As far as him holding onto pots and pans . . ."

100.    Defendant Kester told Ms. Varney that if her ex-husband "sells the stuff," she should wait until after the divorce and then demand reimbursement, and that if her ex-husband sold the property, "It's not a crime, he's just gonna have to reimburse you for it."

101.    Throughout this discussion, Defendant Kester communicated to Ms. Varney that her ex-husband was fully entitled to dispose of supposedly communal property while Ms. Varney risked criminal consequences for doing the same.

102.    Defendant Kester's opinion on these matters was driven by his belief that Ms. Varney's selling supposedly communal property would be "vindictive" and thus "a crime" while her ex-husband doing the same would be legitimate and "not a crime."

**Defendants Kester and Rivera Blamed Ms. Varney for Her Abuse and Failed to Investigate Ms. Varney's Claims of Assault**

103.    During this conversation, Defendant Kester asked Ms. Varney where her wrist injury happened and why the police were not called at the time.  Ms. Varney explained that she was on probation, a fact Defendant Kester stated he already knew.

104.    Had Ms. Varney been permitted to continue speaking, Ms. Varney would have explained that she was on probation after an altercation in September 2020 in which Ms. Varney accidentally scratched her ex-husband as she attempted to defend herself after he kicked her in the stomach and threatened to snap one of her dogs' necks.  Ms. Varney had ultimately deescalated the situation and apologized to her ex-husband for scratching him.

105.    Ms. Varney also would have explained that later the same evening in September 2020, Ms. Varney had informed her ex-husband that she wanted a divorce.  At the urging of her friend, Ms. Varney had called the police to report his earlier physical

18

abuse of herself and her dogs.    After the police had responded to this incident, Ms. Varney's ex-husband's friend falsely reported that he had witnessed the incident and that Ms. Varney was the primary aggressor.

106.    Had Ms. Varney been permitted to continue speaking, Ms. Varney would have explained that she had not defended herself against being labeled the "primary aggressor" because she felt she had no choice.    Ms. Varney was financially dependent on her ex-husband and knew they could not afford for him to face disciplinary action that could result in a loss of rank or pay.

107.    Ms. Varney's taking responsibility for the September 2020 incident resulted in her being charged with third-degree assault, a misdemeanor offense.    Knowing that proceeding to trial would delay her ability to leave her marriage, Ms. Varney had entered a guilty plea in exchange for a non-custodial deferred sentence that included probation.

108.    Ms. Varney's taking responsibility for the incident had also resulted in a mandatory protection order.    The protection order originally included a no-contact provision, but at the request of Ms. Varney's ex-husband, the protection order had been amended in or around March 2021 to a prohibition against harassment.

109.    Ms. Varney intended to explain this situation to the officers, but Defendant Kester interrupted Ms. Varney, stating, "Well you're the victim, right?"

110.    Defendant Kester interrupted Ms. Varney's response, stating, "Well, you're not supposed to be in contact with [your ex-husband], right?"

111.    Ms. Varney explained she was permitted to be in contact with her ex-husband and offered to show Defendant Kester her protection order, which allowed for

contact between her and her ex-husband. Defendant Kester responded, "We kinda looked at it."

112. Ms. Varney said she was under the impression she could not have any police involvement, and that she had been panicked about calling the police "because I thought you guys coming over meant that I was going to get in trouble."

113. Defendant Kester responded, "If you catch another criminal charge, then you're in trouble," but emphasized that if she was the victim of a crime, she should report it.

114. Defendant Kester asked Ms. Varney if there was video of the incident from July 16, 2021.

115. Ms. Varney began searching through her phone for the recording of her ex-husband assaulting her on July 16, 2021.

116. Ms. Varney told the officers, "I was trying to get into the bedroom to get to my dogs because he abuses the dogs. You can see him in the video kicking me and pushing me out of the door."

117. Neither Defendant Kester nor Defendant Rivera acknowledged this report of abuse.

118. Instead, Defendant Rivera asked Ms. Varney whether she had a copy of her protection order.

119. Defendant Kester stated that they had previously taken a look at the protection order, but the officers had found it "confusing."

120. Ms. Varney began searching her phone for a copy of the amended protection order, as she explained the terms aloud to the officers.

121.    Defendant Kester asked, "So why didn't [the hospital] call us, did they say?"

122.    Ms. Varney explained again that she had described the events of July 16, 2021 to the nurse and that the nurse had said that he would call the military police.  When Ms. Varney told the nurse that the military police had informed her that they did not have jurisdiction because the incident occurred off-base, the nurse "just said, 'Oh,' and that was the end of it."

123.    Ms. Varney added that she was trying to find the most updated version of the protection order, as it had been amended in February 2021 at her ex-husband's request.

124.    Defendant Kester then told Ms. Varney that he wanted to see the video of her assault, saying that they could look at the protection order another time.

125.    Ms. Varney handed Defendant Kester her phone to look at the video, pointing out her dogs in the background.

126.    Ms. Varney took Defendant Kester into the room in which the assault had occurred, indicating where her ex-husband had smashed the bedside table and shattered glass all over the floor and the bed.

127.    Ms. Varney then demonstrated what had happened as she attempted to get to her dogs, explaining that her ex-husband was "body-slamming" the door while she was reaching through it.

128.    Returning to the living room, Defendant Kester began watching the video as Ms. Varney narrated, pointing out her dogs in the background and identifying her own voice telling her ex-husband, "You're not going to put your fucking hands on me."

21

129. Ms. Varney later indicated that she had said this just after her ex-husband had shoved her into the wall.

130. After watching the video, Defendant Kester handed Ms. Varney's phone to Defendant Rivera and said, "Alright, hang on, I just don't see any intent in there."

131. Ms. Varney immediately stated that she was not trying to press charges for domestic violence.

132. Defendant Kester told her, "Well, unfortunately, when it comes to domestic violence you don't have a choice."

133. Defendant Kester repeated, "I just don't see the intent," adding, "It's not like he purposefully slammed the door on your arm or anything like that, because that would be a huge problem."

134. As the officers watched the video, Ms. Varney identified two witnesses, her roommates, who were both present in the home during the events of July 16, 2021.

135. One of Ms. Varney's roommates was still visible in the utility closet next to Defendant Rivera, and Ms. Varney gestured toward her and stated, "She was actually in the hallway when it happened" and "she could see everything."

136. Ms. Varney stated that "the girl outside can verify" that Ms. Varney's ex-husband had abused the dogs in the past. As she mentioned "the girl outside," Ms. Varney gestured in the opposite direction of the utility closet and towards her backyard, indicating her other roommate, who had also been present at the home during the assault.

137. As Defendant Rivera watched the video, she began questioning Ms. Varney, asking her to clarify that the individual in the video was Ms. Varney's ex-husband, and that Ms. Varney was the individual trying to get into the room.

22

138.    Ms. Varney confirmed these identities, stating that she was attempting to get into the room "to get my dog, because [my ex-husband] just shoved me."

139.    Defendant Kester replied, "Let me just step out here and talk to my partner real quick."

140.    Defendants Kester and Rivera left Ms. Varney's home to have a private conversation.

141.    Based on the officers' ongoing interrogation that indicated they were questioning Ms. Varney's credibility, Ms. Varney assumed they were not going to help her.

142.    The officers did not return for twenty minutes.

143.    Around that time, Ms. Varney believed that the officers were not coming back, and she got into the shower to clear her head.

144.    Approximately twenty minutes after leaving Ms. Varney's home, the officers knocked on Ms. Varney's door.  Ms. Varney was in the shower and did not answer.

145.    Defendant Rivera later claimed that she attempted to call Ms. Varney.  Ms. Varney was not aware of this supposed attempt because she did not have a record of a missed call or a voicemail.

146.    Neither Defendant Rivera nor Defendant Kester ever attempted to text Ms. Varney or to make contact with her in any other way after that time until Defendant Rivera texted her that the Defendants were putting a warrant out for her arrest.  As such, Ms. Varney was unaware of any attempt by the officers to contact her after initially leaving her home.

147.    Despite Ms. Varney's identification of two witnesses to the assault present at the home during the officers' visit, neither officer made any attempt to speak to the witnesses or obtain a statement from the witnesses.

148.    Defendants Kester and Rivera likewise did not ask Ms. Varney any questions about the context of the video that Ms. Varney showed them, which was approximately 20 seconds long and which Ms. Varney had indicated did not encapsulate the entirety of what occurred.

149.    Defendants Kester and Rivera did not ask if Ms. Varney had any additional footage of what occurred on July 16, 2021.

150.    Defendants Kester and Rivera spent a total of ten minutes speaking to Ms. Varney.  Of that time, the officers spent approximately three and a half minutes discussing the theft of Ms. Varney's property, four and a half minutes questioning Ms. Varney about her visit to the hospital and the terms of her protection order, and only two minutes discussing the domestic violence and sexual assault from the night of July 16, 2021.

**Defendants Kester and Rivera Obtained an Arrest Warrant for Ms. Varney by Deliberately Misrepresenting Evidence to a Judicial Officer**

151.    While outside Ms. Varney's home, Defendant Kester attempted unsuccessfully to call Ms. Varney's ex-husband three times.

152.    Unable to reach Ms. Varney's ex-husband at the scene, Defendant Kester and Defendant Rivera attempted to contact him multiple times that afternoon, which, as Defendant Rivera wrote in her report, took "an extensive amount of time" as "various attempts had to be made to the military to contact him."

153.    That afternoon, at the instruction of the military police, Ms. Varney's ex-husband called Defendant Rivera.

24

154. Defendant Rivera spoke to Ms. Varney's ex-husband for nearly 40 minutes. Defendant Rivera's body-worn camera captured their conversation.

155. Defendant Rivera informed Ms. Varney's ex-husband that CSPD had received a call from Ms. Varney "regarding an injury sustained to her hand maybe over the weekend."

156. Defendant Rivera solicited Ms. Varney's ex-husband's version of events by stating, "You were the victim of something that occurred with her."

157. Defendant Rivera asked Ms. Varney's ex-husband what happened on Friday night and allowed him to speak for several minutes about his version of events.

158. When Ms. Varney's ex-husband explained that the September 2020 protection order had been amended so that he and Ms. Varney could see each other, Defendant Rivera asked, "Do you find [Ms. Varney's behavior] to be a violation of your restraining order at all?"

159. When Ms. Varney's ex-husband did not answer, Defendant Rivera asked, "Do you feel harassed, annoyed, alarmed, concerned for your safety, irritated by her behavior?"

160. Ms. Varney's ex-husband responded, "That's a really hard question, ma'am. Cause there's – that's a heavy question."

161. Defendant Rivera explained that his answer determined whether this matter was criminal or not.

162. Contrary to Ms. Varney's explicit statement that she was not looking to press charges, Defendant Rivera told Ms. Varney's ex-husband, "But she's calling in today to try to get *you* arrested for breaking her arm during that incident."

25

163.    After Defendant Rivera falsely told Ms. Varney's ex-husband that Ms. Varney was attempting to get him arrested, her ex-husband said, "Yeah, it definitely was harassment."

164.    Ms. Varney's ex-husband later recanted these statements and described that he had felt "very pressured into cooperating with the police."

165.    Ms. Varney's ex-husband confirmed that their roommates were present in the home that night and witnessed the argument, and he provided Defendant Rivera with a phone number for one of the roommates.

166.    Ms. Varney's ex-husband admitted that he had pushed Ms. Varney out of the doorway on the night of July 16, 2021, which corroborated Ms. Varney's earlier report to the officers.

167.    Defendant Rivera bypassed Ms. Varney's ex-husband's admission of physical violence by asking, "What happened after you shoved her out of the door?"

168.    Before she ended the call, Defendant Rivera placed Ms. Varney's ex-husband on hold to "confirm something" with Defendant Kester.

169.    When Defendant Kester picked up the call, Defendant Rivera told him, "Harassment and restraining order violation.  Yes.  Easy enough.  He didn't have to say so."

170.    Defendant Rivera then told Ms. Varney's ex-husband that they were charging Ms. Varney with harassment and a restraining order violation "because *she* called to say that you broke her wrist.  Unfortunately for her, the restraining order was still in effect."

171.    Defendant Rivera informed Ms. Varney's ex-husband that she was available to speak to his superior officers to inform them that CSPD was pressing charges against Ms. Varney, indicating that she would support efforts to lift the MPO.

172.    Defendant Rivera expressed her belief that Ms. Varney's ex-husband should be able to return to the house, as it "seems silly for you to have to vacate the premises" because "you are the victim in this particular incident" and that "it doesn't relate the other way around."

173.    Defendant Rivera did not ask Ms. Varney's ex-husband at any point during the 40-minute interview about Ms. Varney's reports of sexual assault, physical assault, theft, or animal abuse – all perpetrated by Ms. Varney's ex-husband.

174.    Neither Defendants Rivera nor Kester ever attempted to contact the two eyewitnesses to the July 16, 2021 events.

175.    Shortly after the interview with Ms. Varney's ex-husband, Defendant Rivera texted Ms. Varney that CSPD was "currently putting in a warrant for your arrest."

176.    In her text, Defendant Rivera claimed that when the officers knocked on Ms. Varney's door after their conversation on July 18, 2021, they had been attempting to inform Ms. Varney that she was under investigation, rather than attempting to ask her any further questions.

177.    Defendant Rivera went on to explain, "It took some time to get a hold of [your ex-husband] to verify whether or not he was harassed by your actions . . . . He confirms that he was," adding, "At this time there are charges of harassment and restraining order violation against you."

27

178. In the arrest warrant application, Defendant Kester misrepresented the reported events of July 16, 2021 and omitted essential facts from Ms. Varney's statements.

179. The arrest warrant application stated, in pertinent part:

On Sunday, 7/18/2021, at approximately 10/09 hours, I, Officer D. Kester 3338, was dispatched to [Ms. Varney's address] to investigate the report of a theft and possible assault that occurred at this location on Friday, 07/16/2021. Upon my arrival, I contacted a female party, who was identified as Rebecca Leigh Varney [DOB redacted]. Ms. Varney stated her husband who she identified as [ex-husband] [DOB redacted], had stolen items from her that included pots and pans. She also informed me of an altercation where she was trying to get into the room where the dogs are kept because she was in fear that [her ex-husband] would beat the dogs based on his past history of abuse to the dogs. She stated she attempted to enter the room, at which time he tried to shut the door and during this altercation, her arm got stuck in the door as he was closing it. She later went to Evans Army Hospital, where she advised me that her arm was fractured.

I asked her if there was video of the incident and she stated there was. Upon viewing the video, I observed [Ms. Varney's ex-husband] already inside the room and Ms. Varney attempting to force her way into the room. [Ms. Varney's ex-husband] can be heard over audio telling her several times to leave him alone and attempting to shut the door to prevent her from entering. After viewing this video, it was determined that further investigation needed to take place and a computer records check showed there was a restraining order in place where [her ex-husband] was the protected party and Ms. Varney was the restrained party. A provision in the restraining order stated that the subject, Ms. Varney, is restrained from assaulting, threatening, abusing, harassing, following, interfering, or stalking the protected party, [her ex-husband]. This restraining order was issued in El Paso County Court room on 9/21/2020 under case number [redacted] and has an expiration date of [redacted]. This restraining order was issued as a result of a domestic violence case.

During a phone conversation with [Ms. Varney's ex-husband] he stated he told Ms. Varney to leave him alone 25-30 times and he felt harassed by Ms. Varney's behavior and that he just wanted to be left alone. [Ms. Varney's ex-husband] confirmed this incident happened on 07/16/2021 between 23:00 hours and midnight. He stated that him and Ms. Varney have been married for just over a year. He was aware a restraining order had been in place and knew some aspects had been dismissed. He also knew that

28

other parts remained to include that she could not have contact with him that was harassing in nature.

180. Defendant Kester portrayed Ms. Varney as unwilling to leave her ex-husband alone despite his request, completely divorcing her actions from Ms. Varney's motivation of protecting her dogs.

181. Defendant Kester failed to mention that the dogs can be seen in the video in the same room as Ms. Varney's ex-husband, which corroborates Ms. Varney's statement.

182. Defendant Kester did not include any reference to Ms. Varney's reports of sexual and physical abuse during the same encounter.

183. Defendant Kester did not include Ms. Varney's ex-husband's admission that he had pushed her during the encounter, which corroborates Ms. Varney's statement.

184. Defendant Kester deemphasized Ms. Varney's report that her ex-husband was "body-slamming" the door as she tried to get to her dogs, writing that Ms. Varney's arm "got stuck in the door as [her ex-husband] was closing it."

185. Defendant Kester did not include any reference to Ms. Varney's report that, as a result of her ex-husband's violence on July 16, 2021, she had been issued an MPO that prohibited her ex-husband from contacting her.

186. Defendant Kester based his probable cause assessment entirely on the existence of the September 2020 protection order, the 20-second video the officers viewed at Ms. Varney's home, and the coerced statements made by Ms. Varney's ex-husband during his call with Officer Rivera.

29

187. Based on this selective evidence, Defendant Kester obtained an arrest warrant for Ms. Varney on July 18, 2021 for violation of a protection order and harassment.

188. As a direct and proximate result of Defendants Kester's and Rivera's inadequate investigation and misrepresentation of evidence, Ms. Varney incurred in the past, and will continue to incur into the future, past and future loss of earnings, loss of earning capacity, and other economic harms.

189. As a direct and proximate result of Defendant Kester's and Defendant Rivera's inadequate investigation and misrepresentation of evidence, Ms. Varney incurred significant non-economic damages including, but not limited to, pain and suffering, inconvenience, emotional distress, and impairment to quality of life.

**CSPD's Internal Investigation Found that Defendants Kester and Rivera Failed to Comply with CSPD Guidelines but Found No Policy Violations Regarding the Methods Used to Formulate Probable Cause**

190. On July 19, 2021, Ms. Varney filed a complaint with CSPD regarding the conduct of Defendants Kester and Rivera, explaining that she felt the charges against her were baseless.

191. She emphasized, "The officers wouldn't let me speak (cut me off or would sigh, roll their eyes and have an attitude) of any of the events that had happened . . . [and] came into my home with an attitude and talked down to me as if I were a criminal and made up their own minds on what happened Friday night."

192. In particular, Ms. Varney wrote, "If they had let me speak on the sexual abuse and animal abuse that led up to me trying to get myself and the animals to safety, I feel things would have gone in a completely different direction."

193.    Ms. Varney also informed the investigator that she was upset to learn that Officer Rivera had told Ms. Varney's ex-husband that Ms. Varney had called the police to have him arrested for breaking her arm.

194.    By contrast, Ms. Varney informed the investigator that she had expressly stated to the officers that she did not want to press assault charges against her ex-husband.

195.    The CSPD Internal Affairs investigation concluded that both officers' conduct had violated CSPD policy by failing to investigate Ms. Varney's report of domestic violence and by failing to make an accurate report of sexual assault.

196.    Specifically, the investigation found that Defendants "were unable to thoroughly investigate the complainant in this case because of how they approached the investigation."

197.    The CSPD Internal Affairs report (hereinafter "IA Report") noted the officers' failure to interview available witnesses who were indicated by both Ms. Varney and her ex-husband.

198.    The IA Report also noted that "[d]uring the limited interview that officers conducted with the complainant, neither officer documented in their report the allegation the complainant made of sexual assault."  The IA Report confirmed that the officers' investigation, and their documentation of it, excluded consideration of essential facts corroborating Ms. Varney's statements.

199.    Defendant Kester was investigated for potential violation of CSPD General Order 1301, "Treatment of the Public," which states in part, "Employees shall maintain a

strictly impartial attitude toward complainants, suspects, and violators, and shall not intimidate or harass any person for personal reasons under the color of authority."

200.    Although the IA Report's case summary acknowledges that Ms. Varney had alleged that Defendant Kester "would not allow her to explain what happened and got impatient with her" and noted that Defendant Kester interrupted Ms. Varney "on several occasions," such conduct is not included in the actual policy violations or findings.

201.    A separate investigative memorandum regarding Defendant Kester's behavior used the phrase "Officer Kester interrupts [Ms. Varney]" no fewer than eight times and states, "Officer Kester did interrupt her and talk over her at times."

202.    The IA Report indicates the foundation of this allegation against Defendant Kester is that "[t]he complainant believes that officers were not impartial but had already made their minds up about what they were going to do before she was able to give a statement."

203.    The IA Report noted that "it appears that Officer Kester was focused on the fact that a protection order existed and not on some of the allegations that were being made by the complainant."

204.    Still, the IA Report concluded that the allegation that Defendant Kester had failed to "maintain a strictly impartial attitude . . . and . . . not intimidate or harass any person" was "unsustained" because the "[e]vidence is insufficient to clearly prove or disprove the allegation."

205.    Although Defendant Kester was required to attend a Crisis Intervention Team class for active listening skills, this corrective action was imposed as a result of Defendant Kester's sustained violations of failing to investigate a domestic violence report

32

and failing to make an accurate report of sexual assault, not due to Defendant Kester's conduct toward Ms. Varney.

206. Defendant Rivera was similarly investigated for potential violation of CSPD General Order 1301.

207. The IA Report indicates the foundation of this allegation against Defendant Rivera is that "[t]he complainant believes that when Officer Rivera texted her to inform her that an arrest warrant was going to be issued, it was unprofessional."

208. Defendant Rivera was also investigated for failing to thoroughly conduct a domestic violence investigation.

209. Neither allegation contains any reference to Ms. Varney's complaint regarding Defendant Rivera's conduct during her call with Ms. Varney's ex-husband.

210. Ms. Varney's complaint regarding Defendant Rivera's conduct during her call with Ms. Varney's ex-husband are not referenced anywhere in the IA Report.

211. The IA investigator listened to the recording of Defendant Rivera's call with Ms. Varney's ex-husband as part of her IA investigation.

212. The IA investigator made no findings regarding whether Defendant Rivera's conduct during the call with Ms. Varney's ex-husband violated CSPD policy.

213. CSPD's Internal Affairs investigation was completed on October 13, 2021.

214. On October 14, 2021, CSPD held an Insight Meeting regarding the results of the investigation, at which three members of Defendants Kester's and Rivera's chain of command were present, including Division Commander Mary Rosenoff.

215. CSPD did not inform the District Attorney's Office (hereinafter "DA's Office") that Defendants Kester and Rivera were under investigation for inadequately investigating

33

Ms. Varney's claims nor that the investigation concluded that their investigation was incomplete.

216.    CSPD has since adopted the Policy DL-600-10 – "IA Findings Notification," which requires that CSPD's Internal Affairs must provide a Credibility Disclosure Notification to the DA's Office within three business days of a sustained finding against an officer.  The Credibility Disclosure Notification must be made "regarding exculpatory or impeaching information that may impact the credibility of a peace officer . . . ."

217.    Although the policy went into effect in 2022, after Ms. Varney's criminal case was fully concluded, the adoption of such a policy indicates that three business days is a reasonable and manageable time for CSPD to notify the DA's Office of any credibility concerns.

218.    Had the policy been in effect, CSPD would have been required to disclose the investigation of Defendants Kester and Rivera to the DA's Office by October 19, 2021 – before Ms. Varney turned herself in.

219.    Similarly, CSPD did not inform the public defenders' office, who represented Ms. Varney, that Defendants Kester and Rivera were under investigation for inadequately investigating Ms. Varney's claims nor that the investigation concluded that their investigation was incomplete.

**Defendants City of Colorado Springs and Vasquez Are Municipally Liable for the Individual Defendants' Actions and Have a Custom and Practice of Permitting Investigations and Prosecutions to Proceed Despite the Absence of Probable Cause, Particularly Against Women Who Report Domestic Violence**

220.    It has long been the custom and actual practice of CSPD to engage in, encourage, and condone its officers proceeding with criminal investigations or even prosecutions despite an absence of probable cause.

221. It is customary in Colorado Springs for officers to pursue criminal investigations and charges against innocent parties despite there being no evidence that those parties committed any crimes.

222. In similar situations, when an initial contact with Colorado Springs police officers does not itself present probable cause for an arrest, CSPD officers will customarily pursue further, unwarranted, investigation in order to devise some probable cause.

223. In Ms. Varney's case, Defendants Kester and Rivera ultimately investigated Ms. Varney for violation of a protection order and harassment despite the fact that she contacted CSPD in relation to a potential theft by her ex-husband.

224. Defendants Kester and Rivera pursued their preconceived theory that Ms. Varney was the aggressor and engaged in criminal conduct despite clear and available evidence to the contrary and to the exclusion of investigating the physical and sexual assault that Ms. Varney also reported.

225. CSPD did not discipline either Defendant Kester or Defendant Rivera or counsel them for these actions.

226. In the course of its IA investigation, CSPD instead sustained violations against both officers relating to their failure to interview witnesses regarding sexual assault and against Defendant Kester for filing an incomplete offense report.

227. Although the IA investigator listened to Defendant Rivera's call with Ms. Varney's ex-husband, the investigator made no finding regarding whether Defendant Rivera's conduct on that telephone call violated department policy.

35

228.    Although Ms. Varney personally complained to the investigator regarding Defendant Rivera lying to Ms. Varney's ex-husband in order to persuade him to allege harassment, the investigator never addressed that complaint in her IA investigation report.

229.    Although CSPD provided active listening training to Defendant Kester, CSPD provided no training to either officer relating to their misconduct in this case.

230.    Namely, the Individual Defendants were not provided any training relating to their practice of presenting selective and misleading evidence to support a prosecution for harassment nor their omission of material facts from the warrant application that resulted in Ms. Varney's prosecution.

231.    The conduct of the Individual Defendants as described in detail herein was consistent with and pursuant to the policies, customs, and training provided to law enforcement officers for use in the situation with which they were confronted.

232.    In the alternative, CSPD's failure to change policies or to discipline or reprimand Defendants Kester and Rivera amounts to acknowledgement of these practices as official policy.

233.    Defendants Kester and Rivera acted intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Ms. Varney's federally protected rights and acted under color of state law in conformity with the preexisting and ongoing deliberately indifferent custom, policy, practice, training, and supervision of Defendants Colorado Springs and Vasquez.

234.    CSPD has a history of transforming civilian contacts into investigations despite a lack of probable cause.

235. In one case, three CSPD officers, including Defendant Rivera, were sued for detaining a Black resident of Colorado Springs while seeking another suspect.

236. According to the description of the suspect provided to officers, the only characteristic the plaintiff shared with the suspect was his race.

237. Even after the officers, including Defendant Rivera, were informed that the plaintiff could not possibly be the suspect, the officers continued to detain the plaintiff, illegally searched him, and called in a warrants check.

238. In connection with an IA investigation in that case, Defendant Rivera was found to have violated department policy by taking the plaintiff's wallet from his pocket, and she faced unspecified "appropriate administrative action" as a result.

239. Defendant Rivera has also been a defendant in another lawsuit alleging that she pursued felony charges against a criminal defendant based on a victim's claim despite available documentary evidence contradicting said account.

240. In particular, Defendant Rivera and her partner allegedly based an arrest warrant on inconclusive video surveillance footage and the supposed victim's statement without conducting a further investigation.

241. On another occasion, a woman (the "Complainant") filed a complaint with CSPD in April 2021, claiming that she had reported a past incident of domestic violence by her ex-boyfriend to Defendant Rivera that resulted in a warrant issued for *her* arrest.

242. The Complainant informed CSPD that "Ofc. Rivera took her boyfriend's side, which resulted in a warrant being issued for [the Complainant]."

243. The Complainant also reported that "she had photos of the bruises but [Defendant Rivera] didn't wait to view the evidence before issuing a warrant for her arrest."

37

244.    On December 29, 2020, the Complainant had been interviewed by Defendant Rivera after calling CSPD to report a domestic violence incident that had occurred over one month prior, during which the Complainant "had been physically assaulted by her now ex-boyfriend, who had grabbed her and thrown her across the front yard.  He had also punched her several times and choked her[.]"

245.    In Defendant Rivera's report of her investigation, she noted that "[the Complainant] also wanted to report other times that he had been physical with her in which no police report had been filed."

246.    Defendant Rivera's report does not contain any information regarding any additional incidents of domestic violence that the Complainant indicated she wanted to report.

247.    Defendant Rivera then "called and spoke with [the Complainant's ex-boyfriend], who initially did not want to make a statement."

248.    Defendant Rivera reported that the Complainant's ex-boyfriend made a statement only after Defendant Rivera "[gave] him a generalized overview of what [the Complainant] said[.]"

249.    During their conversation, the Complainant's ex-boyfriend "admitted to punching [the Complainant] on her hands and forearms," as well as to throwing the Complainant to the ground.

250.    Following this discussion, Defendant Rivera charged *the Complainant*, not the Complainant's ex-boyfriend, with harassment and assault.

251.    CSPD's IA investigation into this complaint determined that the complaint was "unfounded," and CSPD informed the Complainant that "the misconduct did not occur."

252.    CSPD's IA investigation into this complaint concluded on May 4, 2021, over two months prior to Ms. Varney's interactions with Defendants Kester and Rivera, thus placing CSPD on notice of its officers' practice of pursuing domestic violence charges against those who *call* CSPD for help.

253.    Despite the regular occurrence of CSPD officers' – and specifically Defendant Rivera's – investigating and charging victims of crimes with criminal conduct despite evidence supporting the victims' accounts, Defendants Colorado Springs and Vasquez do not adequately train or supervise their officers on the probable cause or reasonable suspicion requirements, or regarding proper and impartial investigative methods, to ensure that the clear ongoing custom and practice of police misconduct as occurred here ceases.

254.    Defendants Colorado Springs and Vasquez knew, based on CSPD's history of similar situations, that its officers would likely take unlawful, unethical, and discriminatory steps to support criminal investigations into innocent civilians like Ms. Varney.  In light of this knowledge, Defendants Colorado Springs and Vasquez should have pursued reasonable methods for training and supervising CSPD officers, including the Defendant officers here, regarding proper and impartial investigative methods as well as the legal and ethical obligation not to manufacture putative probable cause where it does not exist, but they failed to do so.

255.    Because Defendants Colorado Springs and Vasquez created and tolerated a custom of deliberate indifference and failed to adequately train and supervise CSPD officers, innocent civilians like Ms. Varney have repeatedly been subjected to violations of their constitutional rights.

256.    Defendants Colorado Springs and Vasquez fostered "a policy of inaction" in the face of knowledge that CSPD officers were routinely violating specific constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution, which constitutes the functional equivalent of a decision by Colorado Springs itself to violate the Constitution.

257.    Defendants Colorado Springs's and Vasquez's "policy of inaction" and policies, customs, or practices in failing to train properly and supervise their employees were a moving force and proximate cause of the Individual Defendants' violation of Ms. Varney's constitutional rights.

258.    CSPD has persistently failed to investigate and counsel or discipline CSPD officers for their similar practices.  Defendants Colorado Springs's and Vasquez's failure to find wrongdoing and failure to counsel or discipline officers in this case, the cases described above, and others reflects a custom, policy, or practice of encouraging, tolerating, and ratifying illegal conduct.  Defendants' consistent toleration and ratification of such conduct show that CSPD officers carry out such police misconduct under the policies of and regimen of training provided by Colorado Springs, and that such conduct is customary within CSPD.

**After Several Months, Ms. Varney Was Successful in Having
the Charges Against Her Dropped**

259. As soon as she confirmed that the warrant had been issued, Ms. Varney contacted the Colorado Springs Public Defenders' Office and requested an attorney.

260. For the next three months, Ms. Varney's attorney spoke to the Colorado Springs DA's Office about dismissing the charges against Ms. Varney, and Ms. Varney filed multiple motions to quash the warrant in an effort to get her criminal charge dismissed.

261. Ms. Varney's ex-husband supported Ms. Varney's efforts to quash the warrant by voluntarily writing to the court and explaining that he "felt very pressured into cooperating with the police."

262. Ms. Varney's ex-husband requested that the case against Ms. Varney be dismissed because the investigation was "improper and biased" and noted that, in her police report, "Officer Rivera did not state the correct facts and left out details of our conversation."

263. Ms. Varney's ex-husband was contacted by an investigator for the DA's Office, who wrote, "The police officer lied to the victim when she told him that the defendant [Ms. Varney] wanted to press charges against him. . . . [T]he victim felt intimidated by the police office[r] and told her what she wanted to hear, even though it was not true."

264. After repeated failed attempts to quash the warrant and get the case against her dismissed, Ms. Varney turned herself in on October 20, 2021.

265. Ms. Varney spent thirty-six hours in jail, including eight hours in a holding cell with eleven other women.

266.   Ms. Varney was charged with (1) violation of probation and (2) harassment.

267.   On October 21, 2021, Ms. Varney was granted bond in the amount of $3,000 for the alleged probation violation, towards which she was required to pay $300. For the harassment charge, she was released on her own recognizance.

268.   Eight days later, on October 29, 2021, the DA's office dismissed the case against Ms. Varney.

**Ms. Varney Suffered Significant Harm as a Result of the Arrest Warrant**

269.   Prior to the events of July 16, 2021, Ms. Varney had begun to take active steps to leave her ex-husband.

270.   Ms. Varney had been working with her probation officer to move out of state to escape her marriage, a process toward which she had already paid $700 in fees to transfer her probation out of state.

271.   On July 8, 2021, Ms. Varney had already secured a job offer in Nashville with a starting annual salary of $60,000 and the potential for earning up to $100,000 per year with bonuses.  The job offer was dependent on Ms. Varney's ability to pass a background check and move to Tennessee.

272.   Ms. Varney's job offer was rescinded as a direct result of the arrest warrant on her record.

273.   The active arrest warrant prevented Ms. Varney from passing a background check.  As a result, she was unable to obtain alternative employment for four months.

274.   Ms. Varney thereafter remained financially dependent on her ex-husband and was unable to leave her abusive marriage.

275.    The arrest warrant significantly delayed Ms. Varney's ability to seek protection from her ex-husband, who continued to contact her despite the MPO that was still in place.

276.    Afraid that her ex-husband would escalate the violations by attempting to see her in person, Ms. Varney fled from her house so that he could not find her.

277.    Ms. Varney stayed with a friend and slept on her the friend's couch for three months, sacrificing privacy and sleep in exchange for her safety.

278.    During this time, Ms. Varney communicated with the domestic violence advocate she had met with at the hospital in July 2021.  The advocate urged Ms. Varney to obtain a civilian protection order, as the MPO had not deterred her ex-husband.

279.    Afraid to have additional contact with law enforcement, Ms. Varney delayed doing so for several months.

280.    Following Ms. Varney's hospital visit on July 17, 2021, the U.S. Army Criminal Investigation Division ("CID") decided to investigate Ms. Varney's ex-husband for his sexual assaults of Ms. Varney.  Ms. Varney resisted speaking with the special victims advocate until after her charges were resolved because she thought the advocate would similarly dismiss and discredit her testimony as had Defendants.

281.    Because of Defendants Kester's and Rivera's treatment of Ms. Varney, Ms. Varney has experienced fear and stress to the point of hyperventilating when seeing other police cars while driving or having a panic attack when she sees a police officer (from any department) out in public.

43

282.    Ms. Varney now perceives police presence as a threat to her personal well-being, to the extent that she is hesitant to call law enforcement for help out of fear that they will once again distort the situation and arrest her.

## STATEMENT OF CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Fourth Amendment to the Constitution through 42 U.S.C. § 1983 –**
**Malicious Prosecution**
**(Plaintiff against Defendants Kester and Rivera)**

283.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully stated herein.

284.    The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.

285.    42 U.S.C. § 1983 provides a cause of action for a malicious prosecution claim under the Fourth Amendment to the U.S. Constitution where a plaintiff seeks to challenge the legal process by which they were unlawfully seized.

286.    Malicious prosecution occurs when (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted maliciously; and (5) the plaintiff sustained damages. *Shrum v. Cooke*, 60 F.4th 1304, 1310 (10th Cir. 2023).

287.    First, by seeking and obtaining the warrant for Ms. Varney's arrest, Defendants caused Ms. Varney's continued prosecution and confinement.  Second, the charges against Ms. Varney were ultimately resolved in Ms. Varney's favor when the DA's office dismissed both the violation of probation and harassment charges.  *See Thompson v. Clark*, 142 S. Ct. 1332, 1341 (2022).

44

288.     Third, no probable cause supported the original arrest.  When establishing this element, a plaintiff who alleges that officers knowingly supplied false information in affidavits for arrest warrants need only demonstrate an absence of probable cause to support the applications for arrest warrants, rather than the arrest itself.   *Wilkins v. DeReyes*, 528 F. 3d 790, 799 (10th Cir. 2008), *abrogation on other grounds recognized by Shrum v. Cook*, 60 F.4th 1404 (10th Cir. 2023).

289.     Officers are not shielded from liability for malicious prosecution when "they conceal or misrepresent material facts to the prosecutor, whose judgment was thereby influenced by the misstatements."  *Calvert v. Ediger*, 415 F. App'x 80, 83 (10th Cir. 2011) (citing *Pierce v. Gilchrist*, 359 F.3d 1279, 1292-93 (10th Cir. 2004)).

290.     Particularly, an issued warrant will not protect an officer who "knowingly . . . or with reckless disregard for the truth" includes false statements in an arrest affidavit, *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), or who "knowingly or recklessly omit[s] from an arrest affidavit information which, if included, would have vitiated probable cause," *Stewart v. Donges*, 915 F.2d 572, 582-83 (10th Cir. 1990).

291.     While the probable cause standard of the Fourth Amendment does not require officers "to exhaust every possible lead [or] interview all potential witnesses," *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994) (internal quotation marks and citation omitted), officers are *required* "to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all," *Romero v. Fay*, 45 F.3d 1472, 1476-77 (10th Cir. 1995).

292.     In his arrest warrant application, Defendant Kester misrepresented the events of July 16, 2021 by omitting essential facts from Ms. Varney's statements,

45

including reports of sexual and physical abuse and the existence of a military protective order against her ex-husband arising from the events of that evening.

293.   Furthermore, Defendants failed to conduct an adequate investigation when they declined to ask Ms. Varney follow-up questions, declined to speak with two witnesses to the events in question (both of whom were present and available to speak on-scene), and declined to seek or review additional video footage that might corroborate either party's story.

294.   In contrast to the ten minutes Defendants spent speaking with Ms. Varney, during which time Defendant Kester repeatedly interrupted her, Defendant Rivera spoke to Ms. Varney's ex-husband for nearly 40 minutes.

295.   Throughout the interview, Defendant Rivera repeatedly made statements to Ms. Varney's ex-husband such as, "You were the victim of something that occurred with [Ms. Varney]," indicating her preconceived notions of Ms. Varney's guilt and inserting them into the investigation.

296.   Defendant Rivera did not ask Ms. Varney's ex-husband about Ms. Varney's reports of sexual assault, physical assault, theft, or animal abuse – all perpetrated by Ms. Varney's ex-husband.

297.   Ms. Varney's ex-husband was noticeably reluctant to state that Ms. Varney had harassed him.

298.   When Defendant Rivera first asked Ms. Varney's ex-husband whether he felt that Ms. Varney had violated her restraining order, he did not answer.

46

299. When Officer Rivera asked a second time, Ms. Varney's ex-husband expressed hesitance to categorize the interaction as a violation of Ms. Varney's protection order.

300. Ms. Varney's ex-husband agreed that Ms. Varney's conduct constituted harassment only after Defendant Rivera told him, falsely, that "[Ms. Varney]'s calling in today to try to get *you* arrested for breaking her arm during that incident."

301. After Ms. Varney's ex-husband agreed that Ms. Varney's conduct constituted harassment, Defendant Rivera called Defendant Kester and said, "Harassment and restraining order violation. Yes. Easy enough. He didn't have to say so."

302. Ms. Varney's ex-husband later recanted his statements, explaining that he had "felt very pressured into cooperating with the police" and that Defendant Rivera's report "did not state the correct facts and left out details of our conversation."

303. An investigator for the DA's Office, after interviewing Ms. Varney's ex-husband, concluded, "The police officer lied to the victim when she told him that the defendant [Ms. Varney] wanted to press charges against him. . . . [T]he victim felt intimidated by the police office[r] and told her what she wanted to hear, even though it was not true."

304. Fourth, Defendants acted with malice or reckless disregard for the truth, as demonstrated in part by their constant interruption of Ms. Varney, their acknowledgment that if Ms. Varney "catch[es] another criminal charge, then [she is] in trouble" before they took extraordinary steps to justify a criminal charge against her, as well as their coercion of Ms. Varney's ex-husband to agree that Ms. Varney had harassed him.

305. Further, Ms. Varney's ex-husband did not agree to categorize Ms. Varney's actions as "harassment" until after Defendant Rivera misrepresented the basis for Ms. Varney's call and falsely stated that Ms. Varney intended to press charges against him.

306. Defendants Kester and Rivera acted under color of state law and within the course and scope of their employment as law enforcement officers employed by the City of Colorado Springs in the Colorado Springs Police Department at all times relevant to the allegations in this Complaint.

307. The conduct of Defendants Kester and Rivera as described herein and throughout this pleading was attended by circumstances of malice or reckless disregard for the federally protected rights of Ms. Varney.

308. As a result of Defendants' unlawful conduct, Ms. Varney has suffered significant injuries, damages, and losses, both economic and non-economic, in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**Article II, § 7 of the Constitution of the State of Colorado through**
**C.R.S. § 13-21-131 – Malicious Prosecution**
**(Plaintiff Against Defendants Kester and Rivera)**

309. Plaintiff hereby incorporates all other paragraphs of this complaint as if fully stated herein.

310. Article II, § 7 of the Constitution of the State of Colorado prohibits "unreasonable searches and seizures."  Colo. Const. art. II, § 7.

311. Although Article II, § 7 of the Constitution of the State of Colorado guarantees rights similar to those protected by the Fourth Amendment of the U.S. Constitution, these constitutional provisions are distinct, and the Colorado Constitution

affords broader protections than the U.S. Constitution. *See, e.g., People v. McKnight*, 446 P.3d 397, 408 (Colo. 2019); *People v. Oates*, 698 P.2d 811, 815-16 (Colo. 1985).

312. Defendants Kester and Rivera acted within the course and scope of their employment as law enforcement officers employed by the City of Colorado Springs in the Colorado Springs Police Department at all times relevant to the allegations in this Complaint.

313. At all relevant times, Defendants Kester and Rivera were "peace officers" as defined by C.R.S. § 24-31-901(3) and were employed by a local government.

314. Ms. Varney had a protected interest under Article II, § 7 of the Colorado Constitution in being free from unreasonable seizures by law enforcement.

315. "[T]o prevail on a claim for malicious prosecution [under Colorado law], the following elements must be satisfied: (1) the defendant contributed to bringing a prior action against the plaintiff; (2) the prior action ended in favor of the plaintiff; (3) no probable cause; (4) malice; and (5) damages." *Hewitt v. Rice*, 154 P.3d 408, 411 (Colo. 2007).

316. Defendants Kester and Rivera contributed to Ms. Varney's criminal charges by obtaining the warrant for her arrest.

317. The criminal case against Ms. Varney resolved in her favor when the DA's Office dismissed the charges. *See Thompson v. Clark*, 142 S. Ct. 1332, 1341 (2022).

318. Defendants' application for Ms. Varney's arrest warrant was unsupported by probable cause, as they carefully selected certain information to highlight while ignoring other critical facts and as they failed to thoroughly investigate the case by interviewing key witnesses and following up with Ms. Varney.

49

319.    Colorado has adopted a "reasonable person" standard of probable cause. *See Konas v. Red Owl Stores, Inc.*, 158 Colo. 29, 404 P.2d 546 (1965) (internal citation omitted) (probable cause exists where "outside appearances . . . although they might have belied the facts, furnished a reasonable ground of suspicion, and were of such a nature as to warrant a person of ordinary caution in coming to the conclusion that a crime had probably been committed").

320.    No reasonable person, viewing the evidence presented to and offered to Defendants Kester and Rivera, would conclude that Ms. Varney had committed a crime.

321.    Defendants Kester and Rivera acted with malice, as demonstrated by their minimal interview of Ms. Varney, during which they repeatedly interrupted her; their acknowledgment that if Ms. Varney "catch[es] another criminal charge, then [she is] in trouble" before they took extraordinary steps to justify a criminal charge against her; their extended interview of Ms. Varney's ex-husband, during which they openly stated that they viewed Ms. Varney's ex-husband as the victim, failed to inquire about Ms. Varney's reports of abuse, and coerced him into alleging harassment; and their failure to follow up on obvious leads that would have helped them make an accurate determination of the facts.

322.    Ms. Varney suffered economic and non-economic damages as a result of Defendants' conduct, in an amount to be determined at trial.

323.    The conduct of Defendants Kester and Rivera as described herein and throughout this pleading was attended by circumstances of malice or willful and wanton conduct, which Defendants must have realized was unlawful, or that was done heedlessly

and recklessly, without regard to the consequences or of the rights of others, particularly Ms. Varney.

324.    Plaintiff brings this good faith and non-frivolous claim for the express purpose of extending, limiting, modifying, or reversing existing precedent, law, or regulation; or for the express purpose of establishing the meaning, lawfulness, or constitutionality of a law, regulation, or United States or State constitutional right and the meaning, lawfulness, or constitutionality has not been determined by the Colorado Supreme Court.

325.    Specifically, Plaintiff brings this claim in good faith for the express purpose of extending or modifying precedent and for establishing the meaning, application, and lawfulness of C.R.S. § 13-21-131 in light of the recency of the statute's passage and the dearth of precedential case law existing with respect to its interpretation or bounds of effect, as well as the interpretation of the Bill of Rights of the Colorado Constitution as a result thereof.

**THIRD CLAIM FOR RELIEF**
**Fourteenth Amendment to the U.S. Constitution through 42 U.S.C. § 1983 –**
**Equal Protection – Fourteenth Amendment**
**(Plaintiff against Defendant Rivera)**

326.    Plaintiff hereby incorporates all other paragraphs of this complaint as if fully stated herein.

327.    The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall make *or enforce* any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."   U.S. Const. amend XIV, § 1 (emphasis added).

328.   The Fourteenth Amendment's equal protection guarantee "is essentially a directive that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

329.   In cases involving a governmental actor's differential treatment on the basis of gender or sex, the court must determine whether the government can demonstrate that its differential treatment of similarly-situated individuals serves "important governmental objectives" and is "substantially related to achievement of those objectives."  *Concrete Works of Colo., Inc. v. City and Cnty. of Denver*, 321 F.3d 950, 959 (10th Cir. 2003).

330.   Colorado has passed multiple laws surrounding the investigation and prosecution of domestic violence, including the duties of law enforcement officers.  *See* Colo. Rev. Stat. §§ 18-6-800.3–18-6-803.9.

331.   On more than one occasion, Defendant Rivera has unlawfully denied the equal protection of these laws to women who report incidents of domestic violence.

332.   On each of these occasions, the female DV victim reported to Defendant Rivera that she had been physically and/or sexually abused by a male partner.

333.   On each of these occasions, and despite clear evidence of the accused male partner's perpetration of domestic abuse, Defendant Rivera reported the female DV victim as the "primary aggressor" for having allegedly demonstrated harassing behavior.

334.   In each instance, when Defendant Rivera spoke to the male partners accused of domestic violence, they indicated that they did not want to provide a statement.

335. In each instance, the male partners accused of domestic violence only gave a statement to Defendant Rivera after she claimed that reporting victims had called to get charges pressed against the men.

336. In each instance, the men admitted to physical violence against the reporting female victims.

337. In each instance, Defendant Rivera discounted the male partners' admissions of physical abuse that corroborated the female victims' reports.

338. In each instance, Defendant Rivera did not fully investigate the case or review all of the evidence in her possession before pursuing warrants against the female victims who had called CSPD in pursuit of their safety.

339. Defendant Rivera has treated men and women accused of domestic violence differently.

340. In Ms. Varney's case, Ms. Varney and her ex-husband were similarly situated in that each had been accused by the other of domestic violence.

341. Defendant Rivera treated the investigations of Ms. Varney's alleged domestic violence and Ms. Varney's ex-husband's alleged domestic violence differently despite being presented with the same allegations.

342. Defendant Rivera's investigation into Ms. Varney's claims of domestic violence involved watching a 20-second video excerpt and listening to a ten-minute interview of Ms. Varney, during which Ms. Varney was repeatedly interrupted and in which she spoke about the alleged domestic violence incident for only two minutes, without any follow-up questions or inquiries.

343. Defendant Rivera's investigation into Ms. Varney's ex-husband's claims of domestic violence involved conducting a 40-minute interview in which Ms. Varney's ex-husband was permitted to speak about the alleged domestic violence incident without interruption, and during which Defendant Rivera asked numerous follow-up questions and made an active effort to obtain sufficient allegations to support an arrest warrant.

344. Defendant Rivera did not offer Ms. Varney an equal opportunity to provide information, nor did she attempt to obtain from Ms. Varney sufficient allegations to support an arrest warrant against Ms. Varney's ex-husband.

345. During her interview with Ms. Varney's ex-husband, Defendant Rivera repeatedly made statements referring to Ms. Varney's ex-husband as the victim. At no point during the interview of Ms. Varney did Defendant Rivera use those words in reference to Ms. Varney.

346. Defendant Rivera's differential treatment of Ms. Varney serves no important governmental objective.

347. Defendant Rivera's differential treatment of Ms. Varney is not substantially related to the achievement of those objectives.

348. Defendant Rivera acted under color of state law and within the course and scope of her employment as a law enforcement officer employed by the City of Colorado Springs at all times relevant to the allegations in this Complaint.

349. The conduct of Defendant Rivera as described herein and throughout this pleading was attended by circumstances of malice or reckless disregard for the federally protected rights of Ms. Varney.

54

350.    As a result of Defendant Rivera's unlawful conduct, Ms. Varney has suffered significant injuries, damages, and losses, both economic and non-economic, in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**Article II, §§ 25, 29 of the Constitution of the State of Colorado through**
**C.R.S. § 13-21-131 – Equal Protection**
**(Plaintiff against Defendant Rivera)**

351.    Plaintiff hereby incorporates all other paragraphs of this complaint as if fully stated herein.

352.    Although the Colorado Constitution does not contain an identical provision to the Fourteenth Amendment to the U.S. Constitution, "it is well-established that a like guarantee exists within the constitution's due process clause, and that its substantive application is the same insofar as equal protection analysis is concerned." *Lujan v. Colo. State Bd. of Educ.*, 649 P.2d 1005, 1014 (Colo. 1982).

353.    Article II, § 29 of the Colorado Constitution further declares, "Equality of rights under the law shall not be denied or abridged by the state of Colorado or any of its political subdivisions on account of sex." Colo. Const. art. II, § 29.

354.    At all times relevant to the allegations in this Complaint, Defendant Rivera acted within the course and scope of her employment as a law enforcement officer employed by the City of Colorado Springs.

355.    At all relevant times, Defendant Rivera was a "peace officer" under C.R.S. § 24-31-901(3) and was employed by a local government.

356.    Ms. Varney had a protected interest under Article II, §§ 25 and 29 of the Colorado Constitution to equal protection of the law.

357.    For differential treatment based on gender to be reasonable and permissible under Article II, §§ 25 and 29, such differentiation must serve an important government objective and be substantially related to achieving that objective.  *Austin v. Litvak*, 682 P.2d 41 (Colo. 1984) (regarding Colo. Const. art. II, § 25); *Matter of Estate of Musso*, 932 P.2d 853, 855 (Colo. App. 1997) (regarding Colo. Const. art. II, § 29).

358.    Defendant Rivera's differential treatment of men and women involved in domestic violence allegations, and Ms. Varney in particular, does not serve any legitimate, let alone important, government objective.

359.    Defendant Rivera's differential treatment of men and women involved in domestic violence allegations, and Ms. Varney in particular, is not substantially related to achieving an important government objective.

360.    Defendant Rivera did not act upon a good faith and reasonable belief that her actions in investigating Ms. Varney were lawful.

361.    Through her actions, Defendant Rivera subjected or caused Ms. Varney to be subjected to the deprivation of individual rights secured by the Bill of Rights of the Colorado Constitution on account of Ms. Varney's sex.

362.    Ms. Varney suffered economic and non-economic damages as a result of Defendant Rivera's conduct, in an amount to be determined at trial.

363.    Plaintiff brings this good faith and non-frivolous claim for the express purpose of extending, limiting, modifying, or reversing existing precedent, law, or regulation; or for the express purpose of establishing the meaning, lawfulness, or constitutionality of a law, regulation or United States or state constitutional right and the

meaning, lawfulness, or constitutionality has not been determined by the Colorado Supreme Court.

364. Specifically, Plaintiff brings this claim in good faith for the express purpose of extending or modifying precedent and for establishing the meaning, application, and lawfulness of C.R.S. § 13-21-131 in light of the recency of the statute's passage and the dearth of precedential case law existing with respect to its interpretation or bounds of effect, as well as the interpretation of the Bill of Rights of the Colorado Constitution as a result thereof.

**FIFTH CLAIM FOR RELIEF**
**Fourth Amendment to the U.S. Constitution through 42 U.S.C. § 1983 –**
**Municipal Policy – Fourth Amendment**
**(Plaintiff Against Defendants Colorado Springs and Vasquez)**

365. Plaintiff hereby incorporates all other paragraphs of this complaint as if fully stated herein.

366. A municipality is liable for constitutional deprivations under § 1983 when a municipal "policy" or "custom" caused the plaintiff's injury. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978).

367. A municipal government policy or custom that caused an injury results in liability when "the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (citing *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)).

368. A municipality may also "be held liable for failure to adequately train its employees in situations where the potential for constitutional violations is so apparent" and where the failure to train constitutes "deliberate indifference to the rights of persons

57

with whom the police come into contact." *Twitchell v. Hutton*, 2011 WL 318827, at *5 (D. Colo. Jan. 28, 2011) (quoting *City of Canton v. Harris*, 489 U.S. 378, 387-89 (1989)).

369. Defendants Colorado Springs and Vasquez failed to properly train, supervise, and/or discipline their employees regarding proper investigative methods including how to avoid manufacturing putative probable cause where it does not exist. *See, e.g., Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) (citing *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (holding that, because the city policymaker failed to change policies or to discipline or reprimand officials, the jury was entitled to conclude that the complained-of practices were "accepted as the way things are done and have been done in" that city)).

370. Defendants Colorado Springs and Vasquez failed to properly train, supervise, and/or discipline their employees regarding the impartial treatment of citizens involved in domestic violence investigations. *See id.*

371. Defendants' inadequate training, supervision, and/or discipline resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendants Colorado Springs and Vasquez.

372. Considering the duties and responsibilities of personnel of Defendants – who must decide when further investigation or criminal charges are appropriate against a given individual and on whom officers of the court rely to provide complete and accurate information when initiating criminal justice procedures – and the frequency with which such law enforcement personnel will confront circumstances such as those presented herein, the need for specialized training, supervision, and discipline regarding such decisions was so obvious, and the inadequacy of training and/or supervision was so likely

58

to result in a violation of constitutional rights, that Defendants Colorado Springs and Vasquez are liable for their failure to properly train, supervise, and/or discipline their subordinate employees and agents.

373.    Such failure to properly train, supervise, and/or discipline constitutes an unconstitutional policy, procedure, custom, and/or practice that was a moving force behind and proximate cause of the Individual Defendants' malicious prosecution of Ms. Varney.

374.    Defendants acted with malice or reckless indifference to the federally and constitutionally protected rights of Ms. Varney.

375.    As a result of the Individual Defendants' unlawful conduct, as well as Defendants Colorado Springs's and Vasquez's unlawful policies, practices, and customs, Ms. Varney has suffered significant injuries, damages, and losses.

### SIXTH CLAIM FOR RELIEF
**Fourteenth Amendment to the U.S. Constitution through 42 U.S.C. § 1983 – Substantive Due Process – Fourteenth Amendment
(Plaintiff Against All Defendants)**

376.    Plaintiff hereby incorporates all other paragraphs of this complaint as if fully stated herein.

377.    The Fourteenth Amendment of the United States Constitution declares, "No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. art. 14, § 1.

378.    The ultimate standard for evaluating a substantive due process claim is whether the challenged government action "shocks the conscience" of federal judges. *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992)); *see also U.S. v. Salerno*, 481 U.S. 739, 746 (1987)

(substantive due process "prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty").

379.   To show a defendant's conduct is conscience-shocking, a plaintiff must prove a government actor arbitrarily abused his authority or "employ[ed] it as an instrument of oppression." *Hernandez v. Ridley*, 734 F.3d 1254, 1261 (10th Cir. 2013).

380.   Defendants Kester and Rivera both arbitrarily abused their authority and employed their authority as an instrument of oppression throughout their interactions with Ms. Varney and her ex-husband.

381.   In this case, Ms. Varney called CSPD in relation to her ex-husband's theft of her personal property.

382.   Ms. Varney was reluctant, even afraid, to reach out to the police for help after previous experiences being depicted as the aggressor as she defended herself and her animals from her ex-husband's abuse.

383.   However, Ms. Varney had no other options but to reach out to the Colorado Springs Police Department, as she could not afford to simply allow her ex-husband to take possessions worth significant money.

384.   At the time of the events underlying this Complaint, Ms. Varney was in the process of attempting to escape her abusive relationship with her ex-husband.

385.   Ms. Varney had received an offer for a job in another state and had begun the lengthy and expensive process of transferring her probation to that state.

386.   After Defendants Kester and Rivera arrived, Ms. Varney explained to them that her ex-husband had taken valuable and personal property after a dispute.

387.   As Ms. Varney explained the situation, she revealed that the dispute arose from her ex-husband sexually assaulting her, and it culminated with her ex-husband slamming her arm in a door.

388.   Ms. Varney's injuries resulted from her attempts to protect her dogs, whom Ms. Varney's ex-husband had previously abused.

389.   As Ms. Varney described these traumatic events, she also identified witnesses to those events, including two roommates who were present at the home when Defendants Rivera and Kester arrived.

390.   Ms. Varney was not seeking to press charges against her ex-husband, but only to recover her property peacefully.

391.   Upon learning of the dense fabric of sexual, emotional, physical, and financial abuse that Ms. Varney had faced within the previous two days, Defendants Kester and Rivera immediately began to view Ms. Varney as a suspect of a crime yet to be determined.

392.   Defendant Kester interrogated Ms. Varney regarding her injuries, incredulously asking why medical personnel had not notified CSPD if Ms. Varney were telling the truth.

393.   Defendant Kester also opined, in his role as a law enforcement officer, that Ms. Varney's ex-husband was entitled to take any property from the home because it was marital property, but if Ms. Varney were to take or sell any property from the home, it would be "vindictive" and "a crime."

394.   After speaking with Ms. Varney for approximately ten minutes, Defendants Kester and Rivera decided to speak outside the home.

395.    During that conversation, Defendants Kester and Rivera determined that they would pursue criminal charges against *Ms. Varney*, rather than against her ex-husband.

396.    After viewing a short surveillance video clip of Ms. Varney attempting to protect her dogs from abuse, Defendants Kester and Rivera determined to attempt to create a basis for charging Ms. Varney with harassment of her ex-husband, who was abusing her, under the terms of an existing protective order.

397.    In so doing, Defendants Kester and Rivera abandoned any investigation of or attempts to respond to Ms. Varney's allegations of sexual, emotional, physical, and financial abuse by her ex-husband.

398.    In order to secure a charge of harassment and violation of Ms. Varney's protective order, Defendants Kester and Rivera would need for Ms. Varney's ex-husband to state that he felt harassed by Ms. Varney's conduct.

399.    After extensive attempts to contact him, Defendant Rivera finally reached Ms. Varney's ex-husband and spoke with him for approximately forty minutes.

400.    During this conversation, Ms. Varney's ex-husband repeatedly declined to characterize Ms. Varney's behavior as harassing, despite Defendant Rivera's prompting.

401.    Without Ms. Varney's ex-husband agreeing that Ms. Varney's conduct was harassing, Defendants Kester and Rivera would not be able to secure a warrant against Ms. Varney.

402.    Thus, after several attempts, Defendant Rivera lied to Ms. Varney's ex-husband, informing him that Ms. Varney was attempting to press charges against him for injuries arising out of the incident.

403. During her contact with Defendants, Ms. Varney explicitly denied seeking to press such charges.

404. Defendant Rivera told this lie in order to coerce Ms. Varney's ex-husband to claim Ms. Varney's conduct was harassing, as he would be angered by Ms. Varney's alleged attempt to have him arrested and fear being charged himself if he did not agree.

405. As a result of Defendants' conduct, Ms. Varney, an innocent civilian seeking help as she navigated an abusive marriage from a precarious position, was subjected to criminal prosecution stemming from her ex-husband's abuse.

406. By putting her faith in the CSPD to protect her, Ms. Varney ultimately was charged with harassment and violating her protective order.

407. These criminal consequences actually rendered Ms. Varney more vulnerable, as they led to Ms. Varney's job offer and attempts to leave the state being terminated or substantially delayed.

408. These criminal consequences also prevented Ms. Varney from passing a background check necessary to obtain gainful employment and move out of state, deepening her financial dependence on her abusive ex-husband.

409. Defendants Kester's and Rivera's conduct, whereby they transformed the victim of domestic abuse into the victim of baseless criminal charges, shocks the conscience.

410. Upon investigating Defendants Kester's and Rivera's conduct, CSPD sustained violations against both officers relating to their failure to interview available witnesses and against Defendant Kester for filing an incomplete report.

411. However, Defendant Kester received no discipline or corrective action regarding his conduct during his interview with Ms. Varney, including his repeated interruptions of Ms. Varney.

412. Defendant Rivera likewise received no discipline or corrective action regarding her conduct during her interview with Ms. Varney's ex-husband, including her manipulating Ms. Varney's ex-husband into alleging that Ms. Varney had committed a crime.

413. Neither Defendant Kester nor Defendant Rivera were provided with any disciplinary action or training relating to their practice of misrepresenting evidence to support a prosecution for harassment nor their omission of material facts from the warrant application that resulted in Ms. Varney's prosecution.

414. As detailed above, Defendants Colorado Springs and Vasquez knew, based on CSPD's history of similar situations, that its officers, and especially Officer Rivera, would likely take unlawful and unethical steps to support criminal investigations into innocent civilians like Ms. Varney and failed to take any steps to prevent such.

415. Defendants engaged in such conduct with malice or reckless indifference to the federally protected rights of Ms. Varney.

416. Defendants Kester and Rivera acted under color of state law and within the course and scope of their employment as law enforcement officers employed by the City of Colorado Springs at all times relevant to the allegations in this Complaint.

417. As a result of Defendants' unlawful conduct, as well as Defendants Colorado Springs's and Vasquez's policies, practices, and customs, Ms. Varney has suffered significant injuries, damages, and losses.

**SEVENTH CLAIM FOR RELIEF**
**Article II, § 25 of the Constitution of the State of Colorado through**
**C.R.S. § 13-21-131 – Substantive Due Process**
**(Plaintiff Against Defendants Kester, Rivera, and Vasquez)**

418.    Plaintiff hereby incorporates all other paragraphs of this complaint as if fully stated herein.

419.    Article II, § 25 of the Colorado Constitution declares, "No person shall be deprived of life, liberty or property, without due process of law."

420.    The due process clause of the Colorado Constitution, Colo. Const. art. II, § 25, requires at a minimum the same guarantees as those protected by the due process clause of the United States Constitution.  *Air Pollution Variance Bd. v. W. Alfalfa Corp.,* 553 P.2d 811, 816 (Colo. 1976).  The State may enlarge the federal concept of due process, but it may not abridge those rights.  *People ex rel. Juhan v. Dist. Ct.,* 439 P.2d 741, 745 (Colo. 1968).

421.    "Substantive due process prohibits the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty."  *People v. Garlotte*, 958 P.2d 469, 474 (Colo. App.1997) (citing *Salerno*, 481 U.S. at 746).

422.    At all times relevant to the allegations in this Complaint, Defendants Kester and Rivera acted within the course and scope of their employment as law enforcement officers employed by Defendant Colorado Springs and Chief Vasquez.

423.    At all relevant times, Defendants Kester, Rivera, and Vasquez were "peace officers" under C.R.S. § 24-31-901(3) and were employed by a local government.

424.    Ms. Varney had a protected interest under Article II, § 25 of the Colorado Constitution in being free from infringement on her liberty without due process of law.

65

425.    Defendants Kester and Rivera, acting in concert with one another, investigated and prosecuted Ms. Varney with malicious or reckless disregard for the truth.

426.    No reasonable person, viewing the evidence presented to Defendants Kester and Rivera, would conclude that Ms. Varney had committed a crime.

427.    Defendants Kester and Rivera did not at any time during their encounter with Ms. Varney have probable cause or reasonable suspicion, or any other legally valid basis, to believe that Ms. Varney had committed, was committing, or was about to commit any violation of the law.

428.    Defendants Kester and Rivera did not act upon a good faith and reasonable belief that their actions in investigating and prosecuting Ms. Varney without probable cause or reasonable suspicion were lawful.

429.    Through their actions, Defendants Kester and Rivera subjected or caused Ms. Varney to be subjected to the deprivation of individual rights secured by the Bill of Rights of the Colorado Constitution.

430.    Despite the regular occurrence of CSPD officers investigating and charging innocent civilians with crimes despite evidence to the contrary, Defendant Vasquez does not adequately train or supervise his officers on the probable cause or reasonable suspicion requirements, or regarding proper investigative methods such as misrepresenting evidence.

431.    Defendant Vasquez created and tolerated a custom of deliberate indifference to individual rights secured by the Bill of Rights of the Colorado Constitution.

432.    Defendants' conduct is especially shocking in light of the adoption of the Crime Victim's Rights Act, which was ratified as an amendment to the Colorado

Constitution, Colo. Const. art. 2, § 16a, and which clearly reflects the Colorado people's intent to protect victims such as Ms. Varney.

433.   The acts or omissions of Defendants were the moving force behind, and the proximate cause of, injuries sustained by Ms. Varney.

434.   As a result of Defendants' unlawful conduct, as well as Defendant Vasquez's policies, practices, and customs, Ms. Varney has suffered significant injuries, damages, and losses.

435.   Plaintiff brings this good faith and non-frivolous claim for the express purpose of extending, limiting, modifying, or reversing existing precedent, law, or regulation; or for the express purpose of establishing the meaning, lawfulness, or constitutionality of a law, regulation or United States or state constitutional right and the meaning, lawfulness, or constitutionality has not been determined by the Colorado Supreme Court.

436.   Specifically, Plaintiff brings this claim in good faith for the express purpose of extending or modifying precedent and for establishing the meaning, application, and lawfulness of C.R.S. § 13-21-131 in light of the recency of the statute's passage and the dearth of precedential case law existing with respect to its interpretation or bounds of effect, as well as the interpretation of the Bill of Rights of the Colorado Constitution as a result thereof.  Further, Plaintiff believes that *Ditirro v. Sando*, 520 P.3d 1203 (Colo. App. 2022) was incorrectly decided in contravention of the plain language of C.R.S. § 13-21-131 and brings this claim against Defendant Vasquez for the express purpose of modifying or reversing this precedent.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against each of the Defendants, and award her all relief allowed by law, including but not limited to the following:

A. All declaratory and injunctive relief, as appropriate;

B. Actual economic damages as established at trial;

C. Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

D. Punitive damages on all claims allowed by law and in an amount to be determined at trial, subject to the requirements of C.R.S. § 13-21-102(1.5);

E. Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

F. Pre- and post-judgment interest at the highest lawful rate; and

G. Any other appropriate relief at law and equity that this Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated: July 12, 2023

Respectfully submitted,

SPARK JUSTICE LAW LLC

*s/ Laura B. Wolf*
Laura B. Wolf
Erin M. Vanek
1035 Osage Street, Office 836
Denver, CO 80204
(303) 802-5390 (t)
(303) 848-3003 (f)

68

laura@spark-law.com
erin@spark-law.com